# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6261 | **DATE** | 12/9/2003 |
| **CASE TITLE** | McPheron vs. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the attached Memorandum Opinion and Order, the Commissioner's motion for summary judgment is denied (doc. # 12), and Mr. McPheron's motion for remand is granted (doc.# 9). This case is therefore remanded pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this order.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

DEC 1 2 2003
date docketed

Document Number

15

number of notices

date mailed notice

courtroom deputy's initials

mm

Date/time received in central Clerk's Office

U.S. DISTRICT COURT CLERK

FILED-EO

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

STEVEN B. MCPHERON,                )
                                   )
        Plaintiff,                 )
                                   )    Case No. 02 C 6261
v.                                 )
                                   )    Magistrate Judge Sidney I. Schenkier
JOANNE B. BARNHART,                )
Commissioner of Social Security,   )                        **DOCKETED**
                                   )
        Defendant.                 )                        DEC 12 2003

### MEMORANDUM OPINION AND ORDER[1]

The plaintiff, Steven B. McPheron, seeks judicial review of a final decision denying his application for disability insurance benefits, under 42 U.S.C. § 416(i) of the Social Security Act (the "Act"). The parties have filed cross motions for summary judgment: Mr. McPheron seeks reversal or remand of the Commissioner's decision, and the Commissioner seeks a judgment affirming her decision. For the reasons set forth below, the Court denies the Commissioner's motion for summary judgment (doc. # 12), and grants Mr. McPheron's motion for remand (doc. # 9).

### I.

On May 7, 1999, Mr. McPheron applied for a period of disability and disability insurance benefits ("DIB") for an alleged learning disability, borderline intelligence, depression and asthma with an onset date of January 1, 1998 (R. 14, 15). A hearing was held before the Administrative Law Judge (the "ALJ") on March 28, 2000, during which Mr. McPheron, his mother, and a vocational expert ("VE") testified regarding his condition (R. 254- 297). Mr. McPheron's claim was denied by written decision of the ALJ on June 1, 2000 (R. 14- 23). Mr. McPheron then brought a request

---

[1]Pursuant to 28 U.S.C. § 636(c), and the consent of the parties (doc. # 5-6), on December 12, 2002, the case was assigned to this Court for all purposes, including the entry of final judgment (doc. # 7).

15

for review before the Social Security Administration Appeals Council, which included new evidence submitted by his attorney on June 19, 2002. The Council denied the request on July 2, 2002 (R. 5-6). The ALJ's decision therefore became the final decision of the Commissioner. Mr. McPheron filed a timely complaint for administrative review before this Court on September 3, 2002.

## II.

The following facts are taken from the administrative record, the administrative hearing transcript, and the ALJ's written decision. The Court will first discuss Mr. McPheron's personal and medical history. Next, the Court will summarize the hearing testimony and the ALJ's written decision.

## A.

Mr. McPheron was born on May 7, 1978 (R. 60), and was 22 years old when the ALJ made her determination (R. 11, 14). Mr. McPheron lives with his parents, Ursula and Beldon McPheron, and participates in household chores, such as doing the dishes, cleaning the floors and mowing the lawn (R. 86, 280-281). However, Mr. McPheron's mother described the level of help he provides as "little" (R. 280). Mr. McPheron has undergone a series of psychological tests throughout has development and has consistently shown deficiencies in the areas of verbal and math related skills (R. 16-20).

Mr. McPheron's day-to-day activities include playing video games and sports, watching television, talking on the telephone and going out to dinner and movies with friends (R. 88). According to Mr. McPheron's testimony, he has no problem being around crowds or spending time in stores around other people (R. 269). He sees a therapist each week to deal with family and

emotional issues (R. 184-193, 264). And, Mr. McPheron operates under a 10:00 p.m. curfew imposed by his parents, who do not believe they "can trust him for any longer time" (R. 282).

Mr. McPheron has made two trips to Germany, on his own, to visit his grandfather and his girlfriend (R. 283-284). While in Germany, Mr. McPheron helps his grandfather make violins (R. 262-263). This simple labor includes cutting and sanding wood (*Id.*). Mr. McPheron also claims to write letters to his girlfriend in German, but his mother denies his ability to correspond in German (R. 274, 280).

Mr. McPheron is currently unemployed and is not seeking a job at this time (R. 259). When asked what is stopping him from working, Mr. McPheron told the ALJ that he "d[oes]n't know" (R. 267). He has held three jobs in the past as a grocery store stock worker, a restaurant bus boy and a truck loader and unloader for a package delivery service (R. 72). Mr. McPheron left his job at the grocery store to vacation in Germany (R. 259). He does not know why he did not return to that job, but he did respond affirmatively when asked by the ALJ whether he "[c]ould . . . do that kind of job now" (*Id.*). Mr. McPheron's mother expressed a contrary view, noting that it would be "just a matter of time" before he failed in the job (R. 285). He does not remember why he was unable to retain his position as a bus boy (R. 258-259). Mr. McPheron also worked as a truck loader and unloader for a package delivery service for a period of one month (R. 258). Mr. McPheron claims that the task of loading and unloading two trucks simultaneously was too confusing and he could not complete the job satisfactorily (R. 273). He was, therefore, fired from that job (R. 16).

Mr. McPheron graduated from Miner High School in Arlington Heights, Illinois with a special education diploma (R. 57, 284). He also received a high school diploma from Prospect High School, which he earned participating in sports and art classes (R. 100, 284). Mr. McPheron

completed driver's education courses through Northwest Special Education and currently holds an Illinois driver's license (*Id.* at 284). Mr. McPheron took the licensing examination by having someone read the questions to him; he did not read the questions himself (*Id.*) Mr. McPheron's parents do not allow him to drive, because of two prior incidents in which cars he was driving were destroyed (R. 277-78). However, Mr. McPheron testified that he drives once a week (R. 277); this is done without his parents' knowledge, by using an automobile owned by one of his friends (R. 277).

**B.**

Mr. McPheron is physically well. "He has a history of asthma; however, this is no longer an issue for him and he receives no treatment" (R. 16). He also has severe myopia, but this "is correctable with glasses" (R.18). Mr. McPheron claims that his mental impairment is responsible for his inability to retain competitive employment (R. 15).

Mr. McPheron has been diagnosed as suffering from borderline intellectual functioning and mixed personality disorder (R. 152 (Nay Assessment); R. 243 (Arcinas Assessment)). Mr. McPheron "testified that he does not feel depressed" (R. 16). However, the July 1999 evaluation by Dr. Nay, a clinical psychologist, found that Mr. McPheron "has been experiencing difficulty with depression" (R. 150), and . . . "tends toward dependency yet has difficulty negotiating close family relationships" (R. 152-53). He ran away from his family for a period of a few months and "lived on the streets and in shelters," while reportedly dealing with family issues (R. 16, 80, 82, 278-279). He was "non-compliant with his medications during those time periods" (R. 16). Mr. McPheron is currently taking Zoloft and Risperdal at the advice of Dr. Arcinas and his therapist, Ms. VanPuymbrouck, L.C.P.C. (R. 230-235, 261).

4

Mr. McPheron has undergone numerous I.Q. tests throughout his life, and his scores have ranged from 57-70 for Verbal, 80-95 for Performance, and 72-82 for Full Scale I.Q. (R. 95, 102, 118, 124, 129, 154, 172). These various I.Q. tests consistently revealed far lower scores in the verbal component than in other aspects of the tests. Mr. McPheron's July 1999 scores, reported by Dr. Nay when Mr. McPheron was 21 years of age, were as follows: Verbal 68, Performance 91 and Full Scale I.Q. 77 (R. 151). Dr. Nay also reported that Mr. McPheron's reading and math skills, as tested by the Woodcock-Johnson Tests of Achievement Revised, range from a 2.8 to a 3.6 grade equivalency (R. 152, 154). State psychologist Dr. Tomassetti reviewed Mr. McPheron's condition in August 1999, and reported his I.Q. scores as follows: Verbal 57, Performance 82 and Full Scale N/A (R. 172).

Non-I.Q. related information about Mr. McPheron's condition was also conducted during the course of his extensive history of psychiatric evaluations. According to a 1984 intellectual evaluation taken by Dr. Brandt, at the age of six Mr. McPheron exhibited difficulty concentrating and had low impulse control, which the doctor believed was indicative of attention deficit disorder (R. 148). Dr. Brandt also observed that Mr. McPheron had marked difficulties with verbal expression, but found his verbal receptive skills and overall intelligence to be within the normal range (R. 148-149). Due to his developmental and emotional disorders, Dr. Brandt recommended that Mr. McPheron be enrolled in remedial courses at school, which he attended throughout his academic career (R. 149).

Mr. McPheron's 1987 three year re-evaluation revealed much of the same results (R. 127). At age eight, Mr. McPheron's daily living skills, which include his personal, domestic and communication abilities, were observed at the average capability level of about a six-year-old (R.

127). His socialization skills, including interpersonal relationship, play and leisure, and coping skills, averaged out at four years and eleven months, and his communication skills at four years and six months (*Id.*). His math skills were in the "lower extreme range" (R. 128). This evaluation also noted Mr. McPheron's difficulty with concentration (R. 129). Mr. McPheron's spatial and visual-motor coordination skills fell within the normal range for his age (R. 130). The evaluator was encouraged by the fact that Mr. McPheron could be taught to "work with his hands" as easily as the average eight-year-old (R. 131).

Another psychological evaluation, performed in 1989 by the Department of Special Education Services at Norfolk Public Schools, revealed that Mr. McPheron's overall functioning was at the borderline to low average level (R. 124). A notable observation stemming from this evaluation was the large discrepancy between Mr. McPheron's verbal and performance skills. While his performance skills fell within the average range, his verbal skills fell well below par (*Id.*). This evaluation found that Mr. McPheron had "severe, significant language and verbal processing difficulties," as well as "significant memory difficulties" (R. 125).

According to a 1992 adaptive behavior assessment administered by the Northwest Suburban Special Education Organization, Mr. McPheron exhibited trouble with concentration and verbalization, which extended to difficulties expressing ideas, giving directions, telling stories or jokes, writing simple sentences, letters and reports and reading simple stories aloud (R. 107). However, Mr. McPheron showed strengths in the areas of addressing envelopes, writing in cursive and beginning letters (R. 108). Mr. McPheron also showed continued difficulty in tasks of daily living and socialization (*Id.*). However, he did show relative strength in his interpersonal skills and was able to socialize with a "prepared" group of peers (*Id.*).

6

In 1995, when Mr. McPheron was 17 years old, Dr. Kotula described him as having "limited cognitive potential, " and as someone for which "short-term memory . . . appears to be very limited . . ." (R. 91). She found that Mr. McPheron "had difficulty with holding onto information, showed difficulty with sequencing, and with recalling of facts" (R. 92). In 1996, Mr. McPheron's abilities were evaluated by his school (R. 102). This review reported Mr. McPheron's reading skills to be within a 2nd to 3rd grade level, and his math skills at a 5th grade level (*Id.*). Mr. McPheron needed improvement in the areas of basic skills, making change, expressing his feelings, seeking help when needed, and experimenting with vocational skills (*Id.*).

In 1999, at age 21, Mr. McPheron's verbal abilities were reported by Dr. Nay to remain low (R. 151). Mr. McPheron showed relative strength in "visual detail, ability to handle spatial relations, and ability to evaluate social relevance," but was deficient in his "common-sense reasoning skills" (*Id.*). Mr. McPheron's math and verbal skills were reported to range from a 2.8 to 3.6 grade level (R. 152). "His self report and test data suggest that [Mr. McPheron also] experiences depressive symptoms" (R. 153). Dr. Nay diagnosed Mr. McPheron as suffering from a learning disability (R. 152), and as having weakness in working memory (R. 151). Dr. Nay stated that Mr. McPheron suffers from "borderline intellectual functioning" and "dependent personality disorder" (R. 152).

In May 1999, Dr. Arcinas, a psychiatrist, prepared a report of incapacity for the Illinois Department of Public Aid. In that report, Dr. Arcinas diagnosed Mr. McPheron as having a mixed personality disorder and borderline intelligence (R. 243). Dr. Arcinas stated that Mr. McPheron suffered a twenty to fifty percent reduction from full capacity in the activities of daily living, social functioning, and concentration, persistence and pace (*Id.* at 246). Dr. Arcinas recommended

counseling and job training, and stated that it was "too early to make a judgment" about the effectiveness of that treatment (R. 246).

On August 6, 1999, Dr. Conran prepared an assessment of Mr. McPheron in order to "assess ability and functioning in regarding academic programming" (R. 155). Dr. Conran assessed Mr. McPheron as "intellectually impaired with learning disabilities," and as one who has "rather poor judgment in terms of behavior" (R. 157).

On August 17, 1999, Dr. Tomassetti prepared an agency evaluation of Mr. McPheron. Dr. Tomassetti stated that Mr. McPheron suffered from an organic mental disorder (learning disability), but not from mental retardation (R. 171). In explaining the learning disability, Dr. Tomassetti stated that there were "psychological or behavioral abnormalities associated with the dysfunction of the brain," which included borderline intellectual functioning (R. 173). Dr. Tomassetti indicated that this condition would result in slight limitation on restrictions of Mr. McPheron's daily living activity and ability to maintain social functioning; would often result in deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, both at work and elsewhere; but that would never result in episodes of deterioration or decompensation in work or work-like settings (R. 178). Dr. Tomassetti also prepared a functional capacity assessment, in which he indicated that Mr. McPheron would not be significantly limited in a broad range of employment related abilities, and would be only moderately limited in connection with the ability to understand, remember and carry out detailed instructions (R. 180-81). Dr. Tomassetti concluded that Mr. McPheron "has sufficient capacity to perform at least simple, unskilled tasks" (R. 182). Another agency reviewer, Dr. Hermseyer reviewed the file and issued a report dated October 29, 1999, indicating that he concurred in Dr. Tomassetti's assessment (R. 194).

8

On March 3, 2000, Ms. VanPuymbrouck, a clinical psychologist who had treated Mr. McPheron weekly for the prior seven months, expressed the view that Mr. McPheron has "learning disorders in addition to his mental illness which have prevented him from working" (R. 235). Ms. VanPuymbrouck stated that "[t]his client does not appear to be ready for competitive employment due to his inability to follow instructions, understand, carry out, and remember instructions" (*Id.*).

## C.

The administrative hearing took place on March 28, 2000 (R. 254-297). The ALJ asked Mr. McPheron several questions about his employment history during her direct examination of him (R. 257-271). According to Mr. McPheron, his work as a package handler for UPS was too difficult due to the multi-tasking nature of the job; he often was confused by having to load and unload two trucks simultaneously (R. 258). He admitted to working as a busboy prior to his job at UPS, but does not remember why he left that job (R. 258-259). Further, Mr. McPheron testified to working as a stock person at a grocery store, a job he quit to vacation in Germany (R. 259). Mr. McPheron testified that he did not know why he did not return to that employment, but stated that he would be able to "do that kind of job now" (*Id.*) – although, as explained above, his mother disagreed (R. 285). Mr. McPheron also stated that he was supposed to enroll in a vocational training program through Alexian Brothers, where he participates in regular counseling sessions, but that he was too busy spending time with friends and helping around the house to follow up on the status of his enrollment (R. 259-260).

Mr. McPheron testified that he has not had any recent problems with asthma, and does not take prescription medication or use an inhaler as treatment (R. 260-261). He claims that he does not have any problems "walking, standing, sitting, [or] lifting" (R. 266). He has also cut down on his

smoking to "one cigarette every two months – every two weeks or something like that," and drinks anywhere from three to eight alcoholic beverages in social situations (R. 265). He does not bathe daily unless his parents tell him to do so (R. 268-269).

Mr. McPheron reports that he is not depressed, but that he sees a counselor weekly to work through family problems, mostly dealing with his father (R. 264-265). He also has trouble concentrating (R. 270-271). Mr. McPheron takes Zoloft and Risperdal daily to manage his condition, although he is unclear as to when he takes those medications (R. 261). Other than the relationship with his father, Mr. McPheron says that he generally gets along with his family members and friends (R. 269). He also says that he does not have a problem "being out in crowds" (*Id.*).

Mr. McPheron has taken periodic vacations to Germany to visit his grandparents (R. 262). He claims to help his grandfather make violins during his vacations, a task that consists of cutting and sanding the wood used to make the instruments (R. 262-263). Mr. McPheron also claims to have a girlfriend in Germany with whom he communicates in German (R. 263, 267). But, Mr. McPheron's mother, the witness interviewed during the hearing, testified that Mr. McPheron cannot communicate in German (R. 280).

During the examination by his attorney, Mr. McPheron revealed that he has gotten into trouble with the law on several occasions, including being charged for "speeding and getting [into] accidents" and trespassing (R. 271-272). In terms of his mental capabilities, Mr. McPheron claimed to be unable to read the job description of a package loader/unloader at UPS, handed to him by his lawyer, and he also stated his inability to make change (R. 273).

Mr. McPheron's lawyer also examined Ursula McPheron, the plaintiff's mother (R. 275-283). During her examination, Mrs. McPheron voiced her concern with the plaintiff's safety while

10

working, specifically with regard to his former employment at UPS (R. 276). She stated that his allergies have been "starting up again" and that she believes "humidity and . . . dust" would make his allergies worse (*Id.*). She also stated that Mr. McPheron has trouble following directions, making independent judgments, reading, doing arithmetic in the thousands, concentrating, memorizing, and planning (R. 276-277). Mrs. McPheron also stated that she does not let the plaintiff drive anymore, even though he still holds a valid driver's license (to which Mr. McPheron responded that he drives his friend's car without her knowledge) (R. 277).

Ms. McPheron testified that her son has gotten in trouble with the law on prior occasion because he is easily "persuaded"( *i.e.,* taken advantage of) by others (R. 277-278). She bolstered this statement with a story about Mr. McPheron being beat up at a party at their house while she was out of town (R. 278). According to Mrs. McPheron, the party quickly got out of hand due to Mr. McPheron's inability to control the situation (*Id.*). According to his mother, Mr. McPheron also has difficulty dealing with ridicule from the people around him, and has even taken a pay cut to avoid such harassment from a co-worker (R.283).

In terms of everyday tasks, Mrs. McPheron testified that her son does some chores around the house (R. ___). She testified that she must remind Mr. McPheron to bathe daily: Mr. McPheron would go a week without showering if he were not reminded to do so (R. 281). Ms. McPheron also states that her son sees his friends on the weekends, and that he has a curfew of 10:00 p.m.; if he misses the curfew, she pages him (R. 282). Mr. McPheron is able to dial "1-800-collect" in response to pages (*Id.*).

Ms. McPheron also spoke about Mr. McPheron's behavior when he is not taking his medication (R. 282). According to his mother, Mr. McPheron goes ". . . from being very calm to

totally [losing] it. Calling [her] names and kicking things, throwing stuff"(*Id.*). She also recounted two incidents in the past when Mr. McPheron ran away from home; he was not medicated at the time (R. 279).

Ms. McPheron testified that the reason her son is not currently working is that he is "just mentally not stable" (R. 285). However, she did state that a psychologist believes that Mr. McPheron is ready to participate in a vocational training program (*Id.*). Mrs. McPheron believes that the plaintiff's behavior has gone downhill ever since he graduated from day school due to the current lack of structure and a nurturing environment in his life (*Id.*).

Finally, the ALJ and Mr. McPheron's attorney questioned a VE about the plaintiff's condition and his potential to hold a steady job (R. 287-291). The ALJ posed several hypothetical questions to the VE about the ability of someone in Mr. McPheron's position to find competitive employment (R. 289- 291). The VE testified that a 21-year-old individual, with the education and work experience of Mr. McPheron, who must: (1) avoid "concentrated exposure to dust, orders (sic), fumes and gases;" (2) be limited to simple, repetitive jobs "that require little independent judgment and . . . that have only routine changes;" (3) have no general public contact, and (4) tolerate a low to moderate stress level, can be employed as a hand packager, non-construction laborer, or janitor (R. 289-290). In the Chicago Primary Metropolitan Statistical Area, there are approximately 14,000 jobs available for hand packagers, 25,600 jobs for non-construction laborers, and 71,000 jobs available for janitors and cleaners (*Id.*). The VE also stated that if he took Mr. McPheron's testimony as true, he would not be employable because "one must be able on a sustained basis to focus, concentrate on the work task and to relate with peers and co-workers, supervisors and to remember simple instructions" in order to hold competitive employment (R. 290-291).

12

Mr. McPheron's attorney's examination of the VE revealed that if Mr. McPheron were unable to interact with peers, the number of available jobs as a stock clerk and busboy would drop (R. 291). The VE also stated that if this condition existed, then – in addition to an inability to read – there would also be a reduction of about fifty percent in the non-construction laborer field and twenty-five percent in the field of janitorial work (*Id.*). The VE testified that Mr. McPheron would be capable of simple tasks, based on his prior experience as a busboy and bagger (R. 292). However, if Mr. McPheron could remember only to do one or two tasks, the VE testified that there would be a reduction in the number of hand packaging jobs by about fifty percent and an unknown decrease in the number of janitorial jobs (R. 293).

## D.

The ALJ issued her decision on June 1, 2000 (R. 11). The ALJ applied the standard, five-step sequential evaluation pursuant to 20 C.F.R. §§ 404.1520 and 416.920 (2002). At Step 1, the ALJ found that Mr. McPheron had not successfully engaged in substantial gainful activity since the alleged date of onset (R. 15). Therefore, the ALJ found that "there is no basis for denying the claimant's application at the first step of the sequential evaluation" (*Id.*). Furthermore, the ALJ found Mr. McPheron's impairments to be "severe" as defined by Step 2 of the evaluation (*Id.*).

The ALJ, however, found that Mr. McPheron did not meet the requirements of Step 3 (*Id.*). According to her written decision, ". . . as indicated on the . . .Psychiatric Review Technique form [which the ALJ prepared], the claimant's mental/emotional impairments do not meet the requirements or equal the level of severity contemplated under any of the 12.00 mental listing sections" (*Id.*). In so finding, the ALJ made reference to I.Q. tests from 1989 and 1999, which showed verbal I.Q. scores below 70 (R. 17) – which is one of the criteria necessary to meet Listing

13

12.05(C) or (D). The ALJ noted that the medical assessments of Mr. McPheron found him to have "significant language and verbal processing difficulties," and "deficits in . . . auditory short-term memory" (R. 17). The ALJ further acknowledged that the medical evidence indicated that Mr. McPheron is "in the borderline range of intellectual functioning," and was "intellectually impaired with learning disabilities" (R. 17). The ALJ also cited medical evidence that Mr. McPheron had "poor judgment in terms of behavior" (R. 17), and that his "activities of daily living, social functioning, concentration, persistence and pace are twenty to fifty percent reduced from full capacity" (R. 18). In addition, the ALJ noted that Mr. McPheron had experienced episodes of deterioration or decompensation in work or work-like settings "once or twice" (R. 16).

The ALJ nonetheless concluded that the evidence did not support the finding of more than slight restrictions on activities of daily living and social functioning, and more frequent deficiencies of concentration, persistence or pace (R. 16). The ALJ found that "[Mr. McPheron]'s impairments preclude only the following work-related activities: understanding, remembering, and/or carrying out detailed and complex work tasks; interacting appropriately with the general public; handling greater than moderate levels of stress; making more than minimal independent judgments; and handling anything greater than routine job changes" (R. 16).

In so finding, the ALJ pointed to testimony concerning Mr. McPheron's ability to perform certain day-to-day activities, which the ALJ concluded are not "limited to the extent one would expect, given the complaints of disabling symptoms and limitations" (R. 18). The ALJ pointed to Mr. McPheron's participation in household tasks, his ability to socialize with friends, and his trips to Germany. The ALJ also cited as one factor in her assessment of the non-medical evidence the fact that "given the close relationship between [Ms. McPheron] and [her son] the claimant and the

14

possibility that the testimony was influenced in favor of the claimant by a desire to help the claimant cannot be entirely ignored in deciding how much weight it deserves" (R. 20). The ALJ also commented on the "claimant's and his mother's general and persuasive appearance and demeanor while testifying at the hearing" (R. 19), but did not identify particular testimony by the claimant or his mother that he found lacked credibility.[2] The ALJ also indicated that the claimant "has not generally received the type of medical treatment one would expect for a totally disabled individual" (R. 19), without citing to any medical testimony concerning what that level of treatment would be.

The ALJ also found that "the objective medical evidence outlined [in the ALJ's opinion] does not provide a basis for finding limitations greater than those determined in [the ALJ's] opinion," and that "[n]o treating or evaluating physician has rendered an opinion that the claimant is disabled or even has limitations greater than determined in [the ALJ's] decision" (R. 18-19). In reaching that conclusion, the ALJ gave "very little weight" to the opinion of Mr. McPheron's clinical psychologist, Ms. VanPuymbrouck, on the ground that as a clinical psychologist, she is not a medical source" (R. 19). The ALJ did not discuss the report of Dr. Arcinas, which found a substantial reduction in Mr. McPheron's activities of daily living, social functioning, and concentration, persistence and pace, and that Mr. McPheron's condition created difficulty in his maintaining work.

Finally, the ALJ commented on Mr. McPheron's prior – albeit unsuccessful – attempts at work. The ALJ found that "[t]he fact that the impairment did not prevent the claimant from working

---

[2]For example, the ALJ commented that Mr. McPheron testified to his ability to communicate with his girlfriend in Germany in the German language (R. 12), without stating that she found this to be true and without citing Ms. McPheron's testimony that he cannot speak or write German. The ALJ also cited Mr. McPheron's testimony that he tends to his personal grooming (R. 18) and his mother's testimony that he will not bathe unless reminded to do so (R. 16), without finding which was true. And, the ALJ cited Mr. McPheron's testimony that he is not feeling depressed (R. 18) and medical evidence showing depressive symptoms (R. 17), without finding which evidence was credible or why.

at a substantial gainful activity level at that time, even though the work was part-time, strongly suggests that it would not currently prevent work" (R. 20).

Based on this analysis of the record, the ALJ made a specific finding that Mr. McPheron suffered from "the following medically determinable impairments: personality disorder, borderline intelligence" (R. 21, Finding No. 3). The ALJ further found that those impairments "significantly limits the ability to perform basic work activities and are therefore 'severe'" (*Id.*). Nonetheless, the ALJ found that these impairments failed to meet or equal the level of severity contemplated for any impairment listed in Appendix 1 to Subpart P, Regulations and 0.4 (R. 21, Finding No. 4). In making that finding, the ALJ did not specifically discuss Listing 12.05(C) or (D), or how the statements in Finding No. 3 might relate to that listing.

Using these findings, the ALJ moved to Step 4 of the sequential evaluation. The ALJ found that Mr. McPheron has the "residual functional capacity to perform a limited range of heavy work" (R. 22, Finding No. 8), and was limited only in "understanding, remembering, and/or carrying out detailed and complex work tasks; interacting with the general public; handling greater than moderate levels of stress; using more than minimal independent judgment; and handling greater than routine job changes" (*Id.*, Finding No. 6). The ALJ found that Mr. McPheron met the requirements for a Step 4 finding of disability because he did not have any "past relevant work" for which he could presently have the ability to perform (R. 20). In so finding, the ALJ stated that Mr. McPheron "could not keep up with his job as a bagger" (R. 16) – despite Mr. McPheron's testimony that he could "do that kind of job now" (R. 259). The ALJ also noted that Mr. McPheron was fired from his prior job at UPS as a loader because "he could not be trusted to remember all the things he had to do" (R. 16).

16

Finally, the ALJ acknowledged that the burden shifts to the Commissioner at Step 5 "to show there are jobs existing in significant numbers in the economy which the claimant can perform consistent with his or her age, education, work experience, and functional limitations" (*Id.*). Relying on the VE's testimony, the ALJ found that Mr. McPheron would be employable in a substantial number of jobs existing in the fields of hand packaging (14, 000 jobs), labor (32,000 jobs) and janitorial work (71,000 jobs) (R. 22, Finding No. 12). The ALJ concluded that "[Mr. McPheron] has not been under a 'disability' for purposes of [Title II of the Social Security Act at any time since the alleged onset date" (R-21).

On the same date that she issued her opinion, the ALJ also prepared a summary review report entitled "Psychiatric Review Technique" (R. 24-31). In that report, the ALJ found with respect to Listing 12.05 that Mr. McPheron suffered from borderline intellectual functioning, and with respect to Listing 12.08 that Mr. McPheron suffered from a mixed personality disorder (R. 27-28). In discussing Listing 12.05, the ALJ stated that there was no valid verbal, performance or full-scale I.Q. for Mr. McPheron between 60 and 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function (R. 27) – which is the text of Listing 12.05(C). The ALJ did not explain the facial inconsistency between that assessment, and (1) the evidence showing numerous verbal I.Q. scores of less than 70, and (2) Finding No. 3 of her opinion, which states that Mr. McPheron's impairments "significantly limit the ability to perform basic work activities and are therefore 'severe'" (R. 21).

# III.

To establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A)(2002). A claimant must demonstrate that his impairments prevent him from performing not only his past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A). The social security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 (2002). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.*

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact that are

supported by "substantial evidence," 42 U.S.C. §§ 405(g) (2002), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curiam).

Of course, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not select and discuss only that evidence which favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id. See also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). This

is especially true regarding credibility determinations, since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawski*, 245 F.3d at 887. Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

Mr. McPheron challenges the ALJ's findings at Steps 3, 4 and 5 of the sequential analysis. We begin and end our analysis with Step 3, for the reasons stated below.

## IV.

A Step 3 finding requires the ALJ to determine whether a claimant's limitations (which were found severe at Step 2) meet or equal a listed disability found within 20 C.F.R. Part 404, Appendix 1, Subpt. P. At this step, the burden of proof rests with the claimant, who must show that his impairments meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity. *See Young*, 957 F.2d at 389.

This Court is required to test whether an analysis at least "minimally" discusses and considers the evidence on the issue of disability, including evidence that would contradict the Commissioner's final conclusion. *Zurawski*, 245 F.3d at 888; *Clifford*, 227 F. 3d at 870; *Green v. Shalala*, 204 F.3d 780, 781 (7th Cir. 2000). As the Seventh Circuit has repeatedly held, this analysis must build an "accurate and logical bridge from the evidence to [the] conclusion." *Clifford*, 227 F.3d at 872.

Mr. McPheron contends that the ALJ's Step 3 analysis failed to satisfy these standards. Specifically, Mr. McPheron argues that the evidence "shows conclusively" that his "condition meets the severity of § 12.05 for mental retardation, Subsection C, for valid verbal, performance or full scale I.Q. of 60-70 and a physical or other mental impairment imposing additional and significant

20

work related limitation of function" (Pl.'s Mem. at 8). Mr. McPheron further argues that his

impairment also meets the criteria under "Subsection D for valid, verbal, performance, or full scale

I.Q. of 60-70 resulting in at least two of the following including: marked restriction of activities of

daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining

concentration, persistence or pace; and repeated episodes of decompensation, each of extended

duration" (*Id.*). Mr. McPheron argues that the evidence at Step 3 requires an outright reversal of the

ALJ's decision, or at the very least a remand for further proceedings (Pl.'s Mem. at 13).

Each of Mr. McPheron's challenges turn on the application to the evidence to Listing 12.05,

which states in relevant part as follows:

> 12.05. *Mental Retardation and Autism:* Mental retardation refers to a significantly
> subaverage general intellectual functioning with deficits in adaptive behavior initially
> manifested during the developmental period (before age 22). (Note: The scores
> specified below refer to those obtained on the WAIS, and are used only for reference
> purposes. Scores obtained on other standardized and individually administered tests
> are acceptable, but the numerical values obtained on other standardized and
> individually administered tests are acceptable, but the numerical values obtained
> must indicate a similar level of intellectual functioning) . . . .

> The required level of severity for this disorder is met when the requirements in A, B,
> C, or D are satisfied.

> *     *     *

> C. A valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or
> other mental impairment imposing additional and significant work-related limitation
> of function;

> OR

> D. A valid, verbal, performance, or full scale I.Q. of 60 through 70 . . . resulting in
> at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. § 404, Subpart P, Appendix I. For the reasons that follow, we conclude that a remand is in order.

## A

To satisfy the requirements of Listing 12.05(C), the claimant must have (1) a verbal, performance *or* full scale I.Q. of 60-70; and (2) a physical or other mental impairment imposing an additional and significant work-related limitation of function.[3] The Commissioner concedes (as she must) that the medical evidence in the record uniformly supports the conclusion that Mr. McPheron has a verbal I.Q. of less than 70 (Def.'s Mem. at 4-5) – and that this was the case for at least 10 years prior to the hearing.[4] This evidence plainly satisfied the first requirement of Listing 12.05(C).

There is evidence of record that also could satisfy the second requirement of Listing 12.05(C), namely, that Mr. McPheron has "a physical or other mental impairment imposing an additional and significant work-related limitation of function." A substantial body of medical evidence described Mr. McPheron as suffering from borderline intelligence, marked by significant

---

[3]The Commissioner appears to argue that Listing 12.05(C) also requires a claimant "to establish a diagnosis of mental retardation" (Def.'s Mem. at 10). However, courts and commentators alike have explained that Listing 12.05 (like its equivalent for children, Listing 112.05) does not require a claimant whose case was decided prior to the 2001 revisions to the Code of Federal Regulations to establish a separate diagnosis of mental retardation in addition to the requirements of Listings 12.05(C) and (D). *See, e.g., Blakes ex. rel Wolfe v. Barnhart,* 331 F.3d 565, 570 (7th Cir. 2003) (citing cases); *Hall ex. rel. Lee v. Apfel,* 122 F. Supp.2d 959, 965 (N.D. Ill. 2000). Here, the ALJ's decision issued prior to January 1, 2001, so the former regulations – which did not require proof of a diagnosis of mental retardation – apply.

[4]The evidence conclusively establishes this point. A 1989 I.Q. test showed a verbal score for Mr. McPheron of 59 (R. 150). A 1999 test resulted in Mr. McPheron scoring a 57 on his verbal I.Q. (R. 118). In 1995, Mr. McPheron received a verbal I.Q. score of 60 (R. 93). In July 1999, when Mr. McPheron was 21 years old, he took the Weschsler Adult Intelligence Scale-Revised (WAIS-R) test, and he obtained a verbal I.Q. score of 68 (R. 151).

limitations in written and oral verbal skills (as reflected by his I.Q. scores), significant limitations in memory and concentration, and learning disabilities. The medical evidence also is consistent in describing Mr. McPheron as suffering from a personality disorder, sometimes referred to as "dependent personality disorder" (R. 152) or "mixed personality disorder" (R. 243). There is evidence that this disorder has led to Mr. McPheron to exhibit some "aggressive tendencies," which can lead to "conflicts with others over even simple matters" (R. 152). There is evidence from Dr. Arcinas, a psychiatrist who saw Mr. McPheron in 1999, that Mr. McPheron has up to a 50 percent reduction in his capacity for daily living activities, social functioning, and concentration, persistence and pace (R. 246), and from Ms. VanPuymbrouck, a mental health therapist, that Mr. McPheron is not "ready for competitive employment due to his inability to follow directions, understand, carry out, and remember instructions" (R. 235).

In addition, there is anecdotal evidence in the record from Mr. McPheron and his mother that would also support a conclusion that Mr. McPheron's impairments (together with his verbal I.Q.) meet Listing 12.05(C). There is evidence that Mr. McPheron – consistent with the medical opinions concerning aggressive tendencies and poor judgment – has had encounters with the criminal law. There is evidence of his inability to maintain basic hygiene without being constantly reminded, his inability to be trusted with the task of driving a car (and his inability to follow direction to cease from that activity), and his failure to substantially contribute to day-to-day household tasks.

Moreover, in Finding No. 3, the ALJ specifically acknowledged that Mr. McPheron suffered from the impairments of personality disorder and borderline intelligence, and that those impairments "significantly limit the ability to perform basic work activities and are therefore 'severe'" (R. 21). We recognize that this finding is directed toward Step 2 (the existence of a severe impairment);

23

however, that does not mean the finding is irrelevant to Step 3. That is particularly so in this case because the finding at Step 2 specifically states that the impairments "significantly limit the ability to perform basic work activities," which is consistent with the requirement in Listing 12.05(C) that the impairments impose "additional and significant work-related limitation of function."

We are not persuaded that the ALJ built a logical bridge between the evidence and her conclusion that Mr. McPheron's impairments did not meet the listing 12.05(C). In particular, we believe the ALJ failed to "minimally articulate" the reasons for rejecting the foregoing evidence. We focus on several points in particular.

*First*, in deciding to accept the evidence from Dr. Tomassetti that Mr. McPheron did not have significant work-related limitations, the ALJ failed to address arguable inconsistencies between Dr. Tomassetti's opinion and other evidence of record. Dr. Tomassetti opined that Mr. McPheron was not limited in the ability to remember locations, work-like procedures, short and simple instructions, and the ability to pay attention and concentrate for "extended periods" (R. 180). However, the ALJ did not address the arguably contrary finding by Dr. Tomassetti earlier in the same report that Mr. McPheron "often" had difficulty in the area of concentration, persistence and pace (R. 178). The ALJ gave "very little weight" to an opinion by Mr. McPheron's therapist, Ms. VanPuymbrouck, that Mr. McPheron was not ready for competitive employment because she is a therapist and thus not a "medical source" as defined in the Act (R. 19). However, the ALJ did not explain what, if any, weight he gave to that opinion, and did not engage in an assessment of how to balance the weight given to an opinion of the consultative expert like Dr. Tomassetti, who saw Mr. McPheron on one occasion, as opposed to a licensed therapist whose opinion was based on weekly sessions over a seven-month period. Nor did the ALJ attempt to square Dr. Tomassetti's conclusion of only "slight

limitations" with medical evidence that Mr. McPheron reads only at a second or third grade level (R. 16); cannot perform basic functions like making change (*Id.*); and has significant difficulty in recalling and sequencing facts (*Id.*).

Moreover, the ALJ's attempt to dismiss the other medical evidence on the basis that no other doctor "rendered an opinion that the claimant is disabled or even has limitations greater than those determined in this decision" (R. 19) does not do justice to the medical record. The May 1999 evaluation by Dr. Arcinas specifically noted reductions in Mr. McPheron's ability to engage in activities of daily living, social functioning and concentration, persistence and pace that appear to be greater than those found by Dr. Tomassetti or accepted by the ALJ (R. 246), and specifically found that Mr. McPheron had a hard time maintaining employment and that it was too early to tell if counseling and job training would improve that situation (*Id.*). The ALJ does not attempt to reconcile the evaluations of Dr. Tomassetti and Dr. Arcinas.

*Second*, while there are no other medical opinions that specifically address the ability of Mr. McPheron to work, numerous medical opinions describe conditions and limitations that appear to be more severe than those found by Dr. Tomassetti. Dr. Tomassetti found that Mr. McPheron did not suffer from a personality disorder (R. 176), which was contrary to the findings of Drs. Nay and Arcinas – as well as to the finding of the ALJ (R. 21 Finding No. 3; R. 28). To the extent that Dr. Tomassetti's opinion about Mr. McPheron's ability to work was premised on his conclusion that Mr. McPheron did not suffer from a personality disorder, and the ALJ rejected that finding (which she did), it was incumbent upon the ALJ to explain why the evidence of a personality disorder would not change the ultimate conclusion reached by Dr. Tomassetti.

In addition, Dr. Tomassetti found that Mr. McPheron's learning disability and borderline intellectual functioning would "never" result in episodes of deterioration or decompensation in work or work-like settings (R. 178). That finding does not rest comfortably with Dr. Nay's observation that Mr. McPheron has aggressive tendencies which could cause conflicts over simple matters (R. 152). And, it is flatly inconsistent with the ALJ's findings in the Psychiatric Review Technique Form that Mr. McPheron had episodes of deterioration or decompensation in work or work-like settings on one or two occasions (R. 30). Again, there may be good reasons why this evidence contradicting Dr. Tomassetti's finding would not affect the integrity of his overall conclusion – but the ALJ failed to explain what those reasons might be.

*Third*, the ALJ relied on a fact that the Seventh Circuit recently held was inappropriate to consider in making a disability determination. Specifically, the ALJ stated:

> The record reveals the claimant's allegedly disabling impairment was present at approximately the same level of severity prior to the alleged onset date. The fact that the impairment did not prevent the claimant from working at a substantial gainful activity level at that time, even though the work was part-time, strongly suggests that it would not currently prevent work.

(R. 20). The ALJ thus drew a link between Mr. McPheron's prior work history and the work-related function that she believes Mr. McPheron maintains despite his alleged impairments and low verbal I.Q. The ALJ's reliance on this evidence was misplaced. In *Henderson v. Barnhart,* No. 03-1828, 2003 WL 22659653 (7th Cir. Nov. 12, 2003), the Court of Appeals considered a case involving a man with an I.Q. of 70 who was only semi-literate. The district court had affirmed a denial of benefits, noting the claimant's ability to hold a job as a bus driver for six years and that his condition had not worsened significantly since that time. On appeal, the Seventh Circuit reversed, and specifically rejected the district court's reliance on the claimant's prior employment as proof he was not disabled.

26

"[T]he fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation." *Id.*, * 1. The fact that the ALJ here cited evidence of Mr. McPheron's prior part-time work as "strongly suggest[ing]" that he is not currently disabled causes the Court to be concerned that this factor improperly influenced the ALJ's decision.

*Fourth*, the ALJ's credibility findings with regard to Mr. McPheron and his mother are not adequately explained. For example, in Listing 12.05(D), a "marked restriction" in "activities of daily living" would qualify as one of the two impairments necessary to satisfy that section (in addition to the low verbal I.Q. score). There is unrebutted testimony that Mr. McPheron is not able to bathe on a daily basis without someone reminding him to do so – testimony that the ALJ recites (R. 16), but which she does not expressly accept or reject. The ALJ does cite Mr. McPheron's testimony that he tends to personal grooming (R. 18), as well as evidence that "[t]reating sources report that his grooming is adequate" (R. 19). But, that testimony is not squarely inconsistent with Ms. McPheron's testimony that he neglects basic hygiene if not reminded about it daily. If the ALJ rejected Ms. McPheron's testimony, the ALJ failed to explain why; if the ALJ accepted that testimony, she failed to explain why Mr. McPheron's apparent inability to bathe without being reminded to do so does not constitute a "marked limitation" in an "activit[y] of daily living."

The Court also finds the ALJ's credibility findings with regard to Mr. McPheron's mother somewhat lacking. Although we are aware that credibility findings must be "patently wrong" to justify reversal, there must be a sufficient explanation of the credibility findings to assess whether they are "patently wrong." To simply say that "another factor influencing the conclusions reached in this decision is the claimant's, and his mother's, generally unpersuasive appearance and demeanor

while testifying at the hearing" (R. 19), and that "[t]he close relationship between the witness and the claimant [Mr. McPheron] and the possibility that the testimony was influenced in favor of the claimant by a desire to help the claimant cannot be entirely ignored in deciding how much weight it deserves" (R. 20), fails to provide an explanation sufficient to permit meaningful review.

For these reasons, the Court finds that the ALJ failed to build a logical bridge between the evidence and her conclusion that Mr. McPheron's impairments – although "severe" – did not meet or equal Listing 12.05(C). Accordingly, the Court finds that this case must be remanded for further findings consistent with this opinion on the issue of whether Mr. McPheron satisfies the requirements for Listing 12.05(C).

## B.

For the same reasons, the Court also finds a remand warranted with respect to the ALJ's conclusions regarding Listing 12.05(D). Here, the same verbal I.Q. requirement is satisfied. There is also evidence that might satisfy the second requirement of "marked limitations" in at least two of the four areas listed, namely: (1) activities of daily living; (2) maintaining social functioning; (3) deficiencies of concentration, persistence, and pace (resulting in a failure to complete tasks in a timely manner in a work or work like setting); and (4) "repeated episodes of deterioration or decompensation in work or work-like settings." The evidence cited above could support a finding that Listing 12.05(D) was met; the ALJ failed to adequately explain why it did not.

## V.

In *Henderson*, the Seventh Circuit noted that while the claimant's evidence was "not conclusive . . . it was sufficient to require the administrative law judge to probe [plaintiff's] capacity to be a school bus driver more deeply." *Henderson*, 2003 WL 22659653, * 1. In this case, the Court

also finds that Mr. McPheron's evidence is "not conclusive," as there is evidence of record that could support a finding of disability. We, therefore, reject Mr. McPheron's request for outright reversal. But, it is for the ALJ to explain the path from the evidence to her conclusion, in a way that comes to grips with – rather than conclusorily rejects or ignores – evidence to the contrary.

Accordingly, as in *Henderson*, we conclude that a remand is in order so that the ALJ may "probe more deeply" into Mr. McPheron's ability to obtain and hold on a sustained basis one of the jobs which the ALJ concluded Mr. McPheron is capable of performing. On remand, the ALJ will be free to take additional evidence as may be warranted, and should reassess her conclusions at Step 3 and – if the ALJ finds that Mr. McPheron has failed to establish disability at Step 3 – Steps 4 and 5.[5]

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for summary judgment is denied (doc. # 12), and Mr. McPheron's motion for remand is granted (doc. # 9). This case is therefore remanded

---

[5]Because we find that a remand is necessary at Step 3, further analysis of the ALJ's Step 4 and 5 findings, as well as the arguments related to those findings, is not warranted. However, if the ALJ finds again that Mr. McPheron is not disabled at Step 3, she may not merely rely on the opinion she rendered at Steps 4 and 5 in the decision presently before us, but that she must take a fresh look at the record on those Steps (and receive more evidence if she deems it necessary). When she takes that fresh look, the Court believes she should pay careful attention to the cross-examination of the VE during the administrative hearing on the reduction *or* elimination of certain jobs in the categories she said Mr. McPheron could perform, given Mr. McPheron's single task orientation and the noted limitations regarding his inability to deal with the general public, as well as dust and fumes. Finally, the ALJ should not incorporate the standards for disability from Listing 12.05(D) into her RFC finding, which would be legal error.

pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent

with this Order.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated:  December 9, 2003